# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CENTRAL CLAIMS SERVICE, INC.** | **CIVIL ACTION** |
| **VERSUS** | **NUMBER: 10-4672** |
| **CLAIM PROFESSIONALS LIABILITY INSURANCE COMPANY** | **SECTION: "B"(5)** |

## ORDER AND REASONS

Before the Court is the Defendant's Motion to Compel Arbitration and to Stay the instant action (Rec. Doc. No. 5), pursuant to Section 3 of the Federal Arbitration Act ("FAA") and Federal Rule of Civil Procedure 12(b). 9 U.S.C. §3; Fed. R. Civ. P. 12b. Plaintiff filed an opposition to that motion (Record Document No. 14). A reply, sur-reply, and a sur-sur reply were also filed (Record Document Nos.17, 20, 23). For the reasons pronounced below;

**IT IS ORDERED** that Defendant's Motion to Compel Arbitration and Stay is **GRANTED**.

### I. Cause of Action and Facts of Case

Plaintiff filed the instant action on December 30, 2010 as a result of a claim made with CPLIC under an insurance policy discussed below. (Rec. Doc. No. 1).

On March 23, 2005, Plaintiff, Central Claims Service, Inc. ("CCS"), and defendant, Claim Professionals Liability Insurance

Company ("CPLIC") entered into a subscription agreement in which CCS agreed to purchase shares of CPLIC's stock and agreed to apply for insurance with CPLIC. (Rec. Doc. No. 5-2); (Rec. Doc. No. 5-1 at 1-4). Complying with the terms of the subscription agreement, CCS and CPLIC entered into a shareholders agreement on June 8, 2005. (Rec. Doc. No. 5-2 at 1). Both the subscription agreement and the shareholder agreement state: "Each Shareholder expressly agrees that it will not participate in any action against the Company (CPLIC) and that all such disputes shall be resolved by binding arbitration as provided in the Policy". (Rec. Doc. No. 5-2 at 2).

Complying with these agreements, CPLIC issued an insurance policy to CCS for a term of March 17, 2005 to March 17, 2006. (Rec. Doc. No. 14 at 1). The policy contains the following arbitration clause:

> By accepting this policy, you agree to submit any claim of dispute, controversy or disagreement over the Coverage available under this policy, any claim for actual or alleged breach of duty arising out of this policy, or any other dispute or claim of any kind between the Company and any Insured to binding arbitration. In the event of such a dispute, both the Company and you agree that binding arbitration is the sole and exclusive remedy to resolve the dispute.

(Rec. Doc. No. 5-2 at 2); (Rec. Doc. No. 5-1).

## II. Law and Analysis

A. Standard of Review

According to § 2 of the Federal Arbitration Act, a "written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  To enforce this provision, § 3 of the FAA requires courts to stay legal proceedings wherever the disputed issue in the case is within the reach of an arbitration agreement.  *Midwest Mechanical Contractors, Inc.*, 801 F.2d at 751.  In ruling on a motion to stay under § 3, a court must determine (1) whether there exists a written agreement between the parties to arbitrate and (2) whether the issues raised are within the reach of that agreement.  *Complaint of Hornbeck Offshore (1984) Corporation et al v. Coastal Carriers Corporation*, 981 F.2d 752 (5th Cir. 1993).

When determining whether a dispute is covered by an agreement to arbitrate, the United States Fifth Circuit Court of Appeals distinguishes between broad and narrow arbitration clauses.  *Id*. at 754.  If the clause is broad, the action should be stayed and referred to arbitration.  *Id*.  If the clause is narrow, the court must determine whether the agreement encompasses the particular dispute in the case; if not, the matter should not be stayed.  *Id*. at 755.

Because the FAA is a "congressional declaration of a liberal policy favoring arbitration," all doubts as to the arbitrability of

-3-

a dispute must be resolved in favor of arbitration. *Hornbeck*, 981 F.2d at 752; *Harvey v. Joyce,* 199 F.3d 790, 793 (5th Cir. 2000). The party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration. *Gilmer v. interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). As a result, courts must rule in favor of arbitration "whether the problem at hand is the construction of the contract itself or an allegation of waiver, delay or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983).

    Moreover, the FAA's § 3 provisions are mandatory – a court has no discretion to deny a stay unless (1) the presumption in favor of arbitration is overcome with clear evidence that the parties did not intend the claim to be arbitrable, or (2) the agreement does not permit any interpretation that would cover the dispute at issue. *Id.; Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 37 (5th Cir. 1990).

    B. <u>Standard of Applicability of the McCarran-Ferguson Act ("MFA") and Deference to La. R.S. 22:868</u>

    In pertinent part, the MFA states: "No Act of Congress shall be construed to invalidate, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless the act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). Therefore in order for a state law to supersede a federal law, the federal law must be ambiguous

to the business of insurance, and the application of the federal law must invalidate or in some way impair the state law. *United States Dep't of Treasury v. Fabe*, 508 U.S. 491, 500 (1993). The MFA affirms "the supremacy of the States in the realm of insurance regulation. *Id*. The Supreme Court in *Securities and Exchange Comm'n v. National Sec.*, 393 U.S. 453 (1969), analyzed the meaning of "business of insurance" under the MFA. The Court held that the relationship between the insurer and the insured should be the focus in determining what constitutes the "business of insurance." *Id*. at 459. Specifically, the Court found that statutes aimed at protecting or regulating the relationship between insurer and insured, either directly or indirectly, are laws that govern the "business of insurance." *Id*. at 460.

Finally a court will consider three "relevant, but not required" elements: (1) whether the state statute has the effect of transferring or spreading a policyholder's risk; (2) whether the statute is an integral part of the policy relationship between the insurer and the insured; and (3) whether the statute is limited to entities within the insurance industry. *Id*. at 373.

    C. <u>Federal Liability Risk Retention Act ("LRRA") Restrictions on State Law</u>

In passing the LRRA, "Congress specified that the Act would preempt certain state laws that prohibited or hindered the formation of [risk retention groups]." *Mears Trans. Group v. State*

*of Florida*, 34 F.3d 1013, 1016 (11th Cir. 1994), *cert. denied*, 514 U.S. 1109 (1995).  The act states, in part:

> (a) Exemptions from State laws, rules, regulations, or orders:
> Except as provided in this section, a risk retention group is exempt from any State law, rule, regulation, or order to the extent that such law, rule, regulation, or order would-
>
> > (1) make unlawful, or regulate, directly or indirectly, the operation of a risk retention group except that the jurisdiction in which it is chartered may regulate the formation and operation of such a group and any State may require such a group to-
> > > (A) comply with the unfair claim settlement practices law of the State;
>
> > \* \* \*
>
> > (4) otherwise discriminate against a risk retention group or any of its members, except that nothing in this section shall be construed to affect the applicability of State laws generally applicable to persons or corporations.
>
> (f) State powers to enforce State laws
>
> > (1) Subject to the provisions of subsections (a)(1)(G) of this section (relating to injunctions) and paragraph (2), nothing in this chapter shall be construed to affect the authority of any State to make use of any of its powers to enforce the laws of such State with respect to which a risk retention group is not exempt under this chapter.

15 U.S.C. § 3902.

Clarifying, Congress stated that only the laws of non-chartering states that "attempt to regulate, directly or indirectly, the formation and operation of approved risk retention groups . . . are preempted." *Mears Trans. Group v. State of Florida*, 34 F.3d 1013, 1017 (11th Cir. 1994), *cert. denied*, 514 U.S. 1109 (1995).

D. <u>Application to the Instant Motion</u>

When deciding if a party may be compelled to arbitrate, the Court must first determine whether the parties agreed to arbitrate the dispute; if so, the Court then considers whether there is any federal statute or policy that renders the claim non-arbitrable. *Scherer v. Green Tree Servicing, Ltd.*, 548 F.3d. 379, 381 (5th Cir. 2008). First one must determine, whether there is a valid agreement to arbitrate between the parties; and secondly, whether the dispute in question falls within the scope of the arbitration agreement. *Id*.

There is no dispute that parties entered into the relevant agreements in this case, each containing an arbitration clause. (Rec. Doc. No. 5-1). Furthermore, as the agreements are between citizens of different states, and involve commerce, the initial applicability of the FAA is also undisputed. *See* 9 U.S.C. § 2.

However, plaintiff CCS contends that the MFA renders the claim non-arbitrable as a matter of law. It is clear that the FAA is not

a statute relating specifically to the business of insurance. *See Stephens v. American Int'l Insurance Co.*, 66 F.3d 41, 44 (2d Cir. 1995) ("No one disputes the fact that the FAA does not specifically relate to insurance.").

Second, a court must determine whether the state law at issue, La. R.S. 22:868, was enacted for the purpose of regulating the business of insurance,". La. R.S. 22:686 regulates risk by subjecting all insurance policy disputes between an insured and insurer to the possibility of a jury trial. The statute is directed specifically at the relationship between insurer and insured with the aim of protecting policy holders from mandatory arbitration agreements reached in the context of an adhesion contract. *See Buck Run Baptist Church, Inc. v. Cumberland Surety Ins. Co., Inc.*, 983 S.W.2d 501 at 504 (Ky. 1998). Additionally, the language of La. R.S. 22:686 specifically limits itself to insurance contracts. These factors wholly considered, it is clear that the state law at issue in this case specifically concerns the "business of insurance".

Analysis of the third factor of the MFA, whether the application of the federal law invalidates, supersedes or impairs the state law, requires an analysis of the law itself in the context of this case. La. R.S. 22:868 states, in pertinent part:

> A.  No insurance contract delivered or issued for delivery in this state and covering subjects *located, resident, or to be performed in this state, or any group health and*

>   *accident policy insuring a* resident of this state regardless of where made or delivered shall contain any condition, stipulation, or agreement either:
>
>   \* \* \*
>
>   (2) Depriving the courts of this state of the jurisdiction of action against the insurer.

La. R.S. 22:868. On its face, it is clear this statute alone does not prohibit arbitration, so long as arbitration does not deprive Louisiana courts of jurisdiction over an action against the insurer. However, numerous cases in Louisiana and the Fifth Circuit Court of Appeals hold that arbitration does deprive the courts of jurisdiction over an action against an insurer. *Sevier v. United States Fidelity & Guaranty Company*, 497 So.2d 1380, 1385 (La. 1986) (Watson, J., concurring that arbitration clauses divest courts of jurisdiction); *See also Hobbs v. IGF Insurance Company*, 02-26 (La. App. 3 Cir. 1/31/03); 834 So.2d 1069, 1071 ("Enforcement of the arbitration clause would deprive the courts of this state of the jurisdiction of the action against the insurer."); *Woodson Construction Company, Inc. v. R.L. Abshire Construction Company, Inc.*, 459 So.2d 566, 570 (La. App. 3rd Cir. 1984) (discussing that when parties agree to arbitrate, Louisiana courts lack jurisdiction). Although the jurisprudence is relatively clear that arbitration denies Louisiana courts jurisdiction, no court has handled a matter directly analogous to the instant motion as a result of the unique relationship between the parties.

Although the relationship between CCS and CPLIC may be generally characterized within the "business of insurance," CPLIC is not a public offering insurance company. In order to receive insurance from CPLIC, one must also be a shareholder in CPLIC, and as a shareholder, the insured is also invited to participate in the writing process of its eventual policy. (Rec. Doc. No. 17). Particularly distinguishing CPLIC from a typical insurer is that its insurance is not available to members of the general public. (Rec. Doc. No. 17). Furthermore, as a risk retention group classified under the LRRA, CPLIC is prohibited from participating in or benefitting from state guaranty funds. (Rec. Doc. No. 17). As such the relationship between the parties cannot be easily compared to those addressing arbitration denying jurisdiction in insurance contracts, as the insurance contract in this case does not encompass the complete relationship between the parties.

Rather, risk retention groups' unique status necessitates the application of the LRRA to asses the enforcement of the arbitration clause in this case. With the LRRA, Congress sought to preempt non-chartering state laws which impaired the "formation or operation" of qualifying risk retention groups. *Mears Trans. Group v. State of Florida*, 34 F.3d 1013, 1017 (11th Cir. 1994), *cert. denied*, 514 U.S. 1109 (1995); (Rec. Doc. No. 17). The Ninth Circuit notes the unique relationship inherent with risk-retention groups and addresses the restrictions the LRRA places on non-

chartering state laws.

> The exemptions contemplated by the Risk Retention Act were premised on "the limited field of customers that [risk retention] groups could serve." *Home Warranty Corp. v. Caldwell*, 777 F.2d 1455,1468 (11th Cir.1985). Since risk retention groups are "member servicing organizations only," the interest of non-domiciliary states to regulate "insurers dealing with the public was to remain untouched by [the Risk Retention Act]." *Id*. Taken as a whole, 15 U.S.C. § 3902 precludes non-domiciliary state laws that attempt to regulate insurance coverage provided by a risk retention group to its members.

*Primeguard Ins. Co. v. Low*, 113 Fed.Appx. 750, 751-52 (9th Cir. 2004).

CPLIC was chartered in Vermont, making Louisiana a non-chartering state. (Rec. Doc. No. 17). Therefore, if the enforcement of La. R.S. 22:868 impairs the "formation or operation" of risk retention groups, the LRRA will preempt the application of La. R.S. 22:868 via the MFA.

As has been previously discussed, the application of La. R.S. 868 would invalidate the arbitration agreement in place in this case. One of the reasons coverage to risk retention group members is more affordable is the inclusion of arbitration clauses in each of the agreements signed by the parties. (Rec. Doc. No. 17 at 3). By prohibiting arbitration, costs of litigation will increase significantly as compared to arbitration proceedings, which are designed to minimize litigation costs and promote the just and

speedy resolution of disagreements between the group and a shareholder. Prohibiting arbitration under Louisiana law will adversely effect Defendant's operations, a risk retention group founded in Vermont. Applying this scenario to the LRRA, in light of previously cited jurisprudence, it appears the forgoing effect is what the LRRA seeks to avoid.

New Orleans, Louisiana, this 30th day of August, 2011.

_____
UNITED STATES DISTRICT JUDGE